**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ALWAYS AT MARKET, INC.** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:06-CV-2145-BH |
| | § | |
| **RONALD GIRARDI and** | § | |
| **CONTEMPO GROUP, INC.** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the District Court's *Order of Reassignment*, filed January 10, 2007, and the consent of the parties, this matter has been transferred to the undersigned United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c).

**I.  BACKGROUND**

Plaintiff Always at Market, Inc. ("AAM") is a Delaware corporation with its principal place of business in Texas.  AAM is a direct and secondary distributor of watches and other merchandise via the internet, including internet auction sites.  In 2003, AAM hired Defendant Ron Girardi ("Girardi") to develop its watch business.  AAM alleges that during Girardi's employment, he and Defendant Contempo Group, Inc. ("CGI"), a New York corporation, secretly and actively engaged in competition with AAM.

AAM filed suit in the 191st District Court of Dallas County on October 18, 2006.  Girardi and CGI (collectively, "Defendants") removed the suit to federal court on November 20, 2006, on

the basis of diversity jurisdiction. Approximately seven weeks later, the parties consented to the undersigned United States Magistrate Judge for all further proceedings and the entry of judgment. The Court conducted a bench trial on November 3 and 4, 2008. After consideration of the testimony and evidence presented during the trial, the parties' post-trial proposed findings of fact and conclusions of law, the arguments of counsel, and the relevant authorities, the Court finds and concludes as set forth below.

## II.  EVIDENTIARY CONSIDERATIONS

Defendants objected to Plaintiff's Exhibits 16 and 18. Exhibit 16 is a spreadsheet of daily sales reports of merchandise sold by AAM. Exhibit 18 is a spreadsheet summarizing the amount of kickbacks Girardi allegedly received from suppliers during the period of his employment at AAM. Neither of these documents were produced during the discovery period and were only made available to Defendants less than a month before trial. (Tr. at 5, 9-10, 106, 109). Pursuant to Federal Rule of Civil Procedure 37(c)(1), a party that fails to disclose information during discovery as required under Rule 26(a) is not allowed to use that information at trial unless the failure to disclose was substantially justified or harmless. Plaintiff did not provide sufficient reason at trial or in its post-trial submissions for failing to timely produce either Exhibit 16 or 18. Since the failure to produce Exhibits 16 and 18 was not substantially justified, Defendants' objections are **SUSTAINED** and the motions to strike are **GRANTED**.

## III.  FINDINGS OF FACT[1]

1. AAM is, and at all material times has been, a direct and secondary distributor of watches and other merchandise via the internet, including internet auction sites. In this regard, AAM sources merchandise at discounted prices from vendors, typically in Asia, and then either

---

[1] "Ex." designates the party's corresponding trial exhibit. "Tr." designates the two-volume transcript of the bench trial before the Court, which was filed on November 20, 2008. (Docket #62, 63).

      sells the merchandise directly to the end-user customer via the internet or supplies the merchandise to another internet distributor, e.g., an internet auction site, for ultimate sale to the end-user customer. (Tr. at 37-39).

2. AAM's business depends on its knowledge, gained through experience, of information and methodology pertaining to vendors, customers, pricing, costs, and sales histories. This knowledge is unique and confidential to AAM and gives it a competitive advantage, particularly with regard to internet sales in general and internet auctions. (Tr. at 37-39).

3. Prior to his association with AAM, Girardi had approximately 15 years of experience in the operation side of the watch industry, including purchasing, operating warehouses, shipping, and customer service. (Tr. at 204).

4. Beginning on January 1, 2003, AAM employed Girardi as an upper-management level full-time employee with attendant obligations of full-time devotion of services and loyalty to AAM. Girardi was hired for the specific purpose of developing AAM's watch business, including sourcing product from vendors. (Tr. at 39-45, Pl. Ex. 4 (hiring); Tr. at 56 (vice president level); Tr. at 56, 336 (full-time services and loyalty)).

5. Girardi received $84,000 in annual salary as a full-time employee of AAM. AAM also reimbursed Girardi for business expenses, provided stock options, and paid a weekly consulting fee of not less than $1,000 per week. (Tr. at 47; Pl. Ex. 4).

6. At the time of Girardi's hiring, John House ("House"), president of AAM, discussed the possibility of paying a discretionary bonus when the company did well. No bonus system was in place at AAM during Girardi's tenure. (Tr. at 48, 127-28, 141).

7. In furtherance of his day-to-day job responsibilities for AAM, Girardi had access to, and regularly utilized, AAM's proprietary information. Although Girardi had some experience in manufacturing and sourcing watches, Girardi had little, if any, experience in the sale of watches via the internet, including internet auction sales. (Tr. at 39-45, 116, 135-140, 145).

8. In the summer of 2004, Girardi established CGI, a New York corporation of which he was president and owned a 50% interest from its inception. Girardi formed CGI with his business partner, Ed Goldberg ("Goldberg"). CGI engaged in the same or similar watch business as AAM and competed with AAM directly or through intermediaries while Girardi was employed by AAM. (Pl. Ex. 11 (CGI articles of incorporation); Tr. at 329-335 (Girardi's role and interest in CGI); Tr. at 143, 337-338, 353-354; Pl. Ex. 14 (CGI sells watches via internet auction sites)).

9. House was not aware of CGI during Girardi's employment. (Tr. at 74).

10. In the summer and fall of 2004, Girardi and CGI conceived, and subsequently attempted to implement, a business plan whereby they would compete with AAM in the sale of watches

and other products via the internet auction site Ubid, with whom AAM had a substantial existing relationship. (Tr. at 52-56, 130, 161-162, 166-167; Pl. Ex. 15).

11. Girardi and CGI diverted business opportunities away from AAM by selling watches on Overstock.com under the "Prague" brand in direct competition with AAM's top-selling "Bolle" brand. Both brands were sourced from the same vendor (Asad Massoud) and were virtually identical. Sales of Prague on Overstock.com were detrimental to AAM's business. (Tr. at 65-73, 149-55; Pl. Ex. 15).

12. In late 2004 and early 2005, Girardi and CGI entered into a venture with an Ohio company (Hour Power) for the manufacture and distribution of watches. AAM was not aware of this arrangement. Girardi solicited Ron Wollman ("Wollman") to assist in this venture, and Girardi told Wollman that he was "unhappy" at AAM and had formed a competing business. (Tr. at 156-60, 170-71; 345-47; Pl. Ex. 15).

13. Girardi used an anonymous email address to communicate with Wollman. Girardi sent AAM's proprietary information to Wollman unbeknownst to AAM. (Tr. at 172, 175-77, 393; *see* Pl. Ex. 15).

14. While employed by AAM, Girardi arranged for the payment of undisclosed "kickbacks" (an additional amount per watch) from AAM vendor Asad Massoud. Girardi was in charge of sourcing the product from Massoud, who would be paid by AAM and then pay the kickbacks to Girardi, either directly or through his partner, Goldberg. (Tr. at 57-59, 185-86, 390; Pl. Ex. 17, 22).

15. AAM presented evidence showing Girardi received kickbacks on 70,000 units purchased from AAM vendor Asad Massoud. The amount of the kickbacks paid to Girardi from Massoud equaled $10 per unit on 11,320 units and $2 per kickback on the remaining 58,680 units. (Tr. at 102-104, 119, 362; Pl. Ex. 22).

16. The kickbacks were used by Girardi to fund the start-up costs and operations of CGI. (Tr. at 165-66; Pl. Ex. 22).

17. AAM was not aware of these kickbacks and only learned of them after Girardi left AAM in April of 2005. The kickbacks were detrimental to AAM's business interests and beneficial to Girardi and CGI. (Tr. at 57-59, 189).

18. AAM sent Girardi a letter dated April 15, 2005, advising him that he had been terminated effective April 2, 2005. He was paid for work through April 2, 2005. (Tr. at 95-96, 198, 310; Pl. Ex. 8; Def. Ex. 10).

19. Girardi continued to perform his normal duties from April 3 to April 15, 2005. He was not paid for this work. (Tr. at 161, 309-10; Def. Ex. 10).

20. John Walker ("Walker"), the Chief Financial Officer for AAM, testified that AAM reimbursed Girardi for all of the expenses he incurred while employed at AAM. Walker provided documentation to support payments for all of Girardi's submitted expenses. (Tr. at 198-200; Pl. Ex. 9).

21. Girardi continued to secretly gain access to AAM's proprietary information after he left AAM's employ. (Tr. at 17-118).

## IV. CONCLUSIONS OF LAW

### A. **Plaintiff's Claims**

1. A valid contract exists when the following elements are satisfied: (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 150 (Tex.App.–Houston [1 Dist.], no pet.). The Court concludes that Girardi had a valid contract with AAM to develop AAM's watch business as an upper management full-time employee. (Findings of Fact, ¶¶4, 5).

2. The essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *Valero Marketing & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex.App.–Houston [1st Dist.] 2001, no pet.). The Court concludes that these elements are satisfied and Girardi breached his contract with AAM by engaging in wrongful conduct. (Findings of Fact, ¶¶7, 8, 10, 11, 12, 14, 15, 16).

3. A fiduciary relationship existed between AAM and Girardi. (Findings of Fact, ¶4); *Molex, Inc. v. Nolen*, 759 F.2d 474, 479 (5th Cir.1985) (applying Texas law and holding that a sales representative had a fiduciary relationship with his employer); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513 (1942) (holding that a "trusted" salesman occupied the relationship of a fiduciary to his employer). As a result of this fiduciary duty, Girardi had a duty to act primarily for the benefit of the AAM in matters connected with his agency. *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex.App.–Houston [1st Dist.] 2003, no pet.).

4. The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (*citing Jones v. Blume*, 196 S.W.3d 440, 447 (Tex.App.–Dallas 2006, pet. denied)). The Court concludes that these elements are satisfied and Girardi breached his fiduciary duty to his employer. (Findings of Fact, ¶¶4, 7, 8, 10, 11, 12, 14, 15, 16).

5. AAM's business depends on trade secrets involving internet sales and auctions of watches

and other merchandise. *See* Tex. Penal Code §31.05(a)(4). (Findings of Fact, ¶2).

6. Under Texas law, trade secret misappropriation is established by showing: (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (3) use of the trade secret without authorization from the plaintiff. *Alcatel USA Inc., v. DGI Technologies, Inc.*, 166 F.3d 772, 784 (5th Cir. 1999). The Court concludes that these elements are satisfied and Girardi is liable to AAM for common law and statutory misappropriation of trade secrets and property from AAM. *Navigant*, 508 F.3d at 283; *Alcatel*, 166 F.3d at 784; Tex. Civ. Prac. & Remed. Code §§ 134.003. (Findings of Fact, ¶¶7, 10, 21).

7. In Texas, the elements of a cause of action for tortious interference with contractual relations are: (1) there was a contract subject to interference; (2) the act of interference was willful and intentional; (3) such intentional act was a proximate cause of plaintiff's damages; and (4) actual damage or loss occurred. *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793 S.W.2d 660, 664 (Tex. 1990). The Court finds that these elements are satisfied and Girardi tortiously interfered with his contract with AAM. (Findings of Fact, ¶¶7, 8, 10, 11, 12).

8. The elements of unfair competition or common law misappropriation have been defined as: (1) the creation of plaintiff's product through extensive time, labor, skill, and money; (2) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff. *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex.App. – Waco 1993, writ denied). The Court finds that these elements are satisfied and Girardi engaged in unfair competition with Plaintiff. (Findings of Fact, ¶¶7, 8, 10, 11, 12).

9. It is settled law in Texas that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942). A cause of action premised on contribution to a breach of a fiduciary duty under *Kinzbach* must involve the knowing participation in such a breach. *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex.App. – Austin, 2001, pet. denied). The Court concludes that CGI knowingly participated in Girardi's breach of contract and fiduciary duty to AAM. (Findings of Fact, ¶¶8, 10, 11, 12).

10. AAM did not meet its burden to prove by a preponderance of the evidence the exact amount of damages it sustained as a result of Girardi's unlawful competition or misappropriation of trade secrets. AAM admits that the amount of damages is uncertain and urges the Court to impose a forfeiture of Girardi's compensation as a remedy. In support of this novel theory, it cites to *Burrow v. Arce*, 997 S.W.2d 229, 237-38 (Tex. 1999). (Docket #66, at 13). *Burrow* addressed forfeiture of attorney fees for alleged breach of contract and fiduciary duty. No Texas court or any court in the Fifth Circuit has extended this reasoning to

breaches by non-attorneys, and the Court declines to do so here.

11. Since AAM did not meet its burden to prove any actual damages for misappropriation of trade secrets, it is not entitled to the $1,000 in damages provided for under the Texas Theft Liability Act. Tex. Civ. Prac. & Remed. Code § 134.005(a)(1); *Alcatel*, 239 F.Supp.2d at 674 (award of statutory damages is contingent upon award of actual damages).

12. AAM met its burden to show by a preponderance of the evidence that the monetary damages on the kickback scheme amounted to $230,560.[2] Girardi and CGI are liable to AAM, jointly and severally, for monetary damages in this amount. (Findings of Fact, ¶15).

13. AAM did not meet its burden to prove by a preponderance of the evidence that Girardi's unlawful conduct was reprehensible enough to warrant an award of exemplary damages. *See Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 45-46 (Tex. 1998) (degree of reprehensibility of defendant's conduct is the most important factor in determining punitive damages); *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996) (conduct that endangers health or safety merits more punishment than purely economic harm).

14. Girardi and CGI are liable to AAM, jointly and severally, for reasonable and necessary attorney's fees for misappropriation of trade secrets. Tex. Civ. Prac. & Remed. Code § 134.005(b); *Johns v. Ram-Forwarding, Inc.*, 29 S.W.3d 635, 637-38 (Tex.App. – Houston [1st Dist.], 2000, no pet.) (award of attorney's fees under § 134.005(b) depends on whether prevailing party succeeds on the merits, not on whether damages were awarded).

## B. **Defendants' Claims**

15. AAM owes Girardi $4,851.78,[3] less any applicable withholding, for unpaid wages resulting from work performed between April 2, 2005 (date of last pay check) to April 15, 2005 (date of letter advising of termination). (*See* Findings of Fact, ¶¶5, 18, 19).

16. AAM did not meet its burden to show by a preponderance of the evidence that any of the raised defenses justify its failure to pay Girardi for work performed.

17. The Court declines to apply the *Burrow* holding of forfeiture to Girardi's wage claim.

18. Girardi's contract claim for unpaid wages is not barred by *res judicata* because the administrative agency did not rule on the merits of the claim; it found that it did not have jurisdiction. The case cited by AAM in support of this argument, *Igal v. Brightstar Technology Group, Inc.*, 250 S.W.3d 78 (Tex. 2008), is inapplicable because the

---

[2] $230,560 = ($10 x 11,320 units) + ($2 x 58,680 units).

[3] $4,851.78 = (13 days ÷ 365 days per year) x ($84,000 per year) + ($1,860 of weekly bonus at $1,000 per week for 1.86 weeks).

administrative agency in *Igal* had jurisdiction over the claimant's case.

19. Girardi did not meet his burden to show by a preponderance of the evidence that AAM owed him any money for unreimbursed expenses. (Findings of Fact, ¶20).

20. AAM is not liable to Girardi for any bonus since the employment contract does not provide for a bonus. (Findings of Fact, ¶5, 6). To the extent that there was an oral agreement for a bonus, it is unenforceable because the terms of the alleged supplemental compensation were neither clear, certain, nor definite. *Haden Co. v. Riggs*, 84 S.W.2d 789, 798 (Tex.Civ.App. – Galveston 1935), *aff'd*, 94 S.W.2d 152 (1936) (terms of oral contract must be clear, certain, and definite); *Moore v. Dilworth*, 179 S.W.2d 940, 942 (Tex. 1944) (indefinite agreement is an unenforceable contract because the court cannot fix the legal obligations to the liabilities of the parties).

## V. CONCLUSION

For the foregoing reasons, the Court finds that Girardi and CGI are liable to AAM, jointly and severally, for monetary damages in the amount of $230,560 for the kickback scheme. Girardi and CGI are liable to AAM, jointly and severally, for reasonable and necessary attorney's fees for prosecution of the misappropriation of trade secrets claim. AAM is liable to Girardi in the amount of $4,851.78, less any applicable withholding, for unpaid wages.

**SO ORDERED** on this 16th day of April, 2009.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 8 -